Good morning. Is Mr. Matthews here? Yes? Alright, we will start with the second case on the docket this morning. 051280, Advanced Cardiovascular v. Medtronic. 051280, Advanced Cardiovascular v. Medtronic. Yes, Your Honor. I would like to highlight three of Medtronic's points that I think will be most helpful to the court this morning. The first is one that's addressed in pages 23-24 and 56 of Medtronic's opening brief and at page 62 of Boston Scientific's brief. And that is the point that we believe that any disclaimer that the trial court found with regard to the earliest patent, the 331 patent, has no applicability whatever, no possible applicability to the last patent, the 053 patent. The court relied on what it believed to be a clear and unmistakable disclaimer in the 331 prosecution history to find that there could be no infringement, even under the doctrine of equivalence, as to any of the four patents. But even if there was a disclaimer as to the first patent, it's crystal clear that it could not possibly apply to the last patent, the 053 patent. This court has held on a number of occasions where the applicant makes it clear that certain remarks don't apply to certain claims. There's no room for applying the surrender or disclaimer doctrine. Do you think this disclaimer is over Palmaz? Yes, Your Honor. And it was in the 331 prosecution history. And I'm going to address why I don't think there was a disclaimer even there. But my first point is even if there was, it can't possibly apply to the 053 because an applicant can, is allowed to make it clear that a disclaimer only applies to certain claims and not to others. And if you think about, there's a very good policy reason for that. The only reason you look for a disclaimer is to see whether a reasonable third party could rely on that disclaimer in discerning what the scope of the claims in question are. If the applicant makes it clear the disclaimer doesn't apply to certain claims, there's no reason to apply that. And that's really precisely what happened here. In the application for the 053 patent, the applicant made it crystal clear that these claims, quote, it was explained to the examiner the pending claims were specifically drafted to cover the competitor products, including the very accused product here, the ACS multi-linked stent. Now the defendants here, the appellees, call these self-serving statements, and they say, well, the patent office didn't assign a paper number to those papers. But the question is not whether they're self-serving or whether the PTO complied with its own policies. These papers are unquestionably part of the public record. In fact, ACS cites this very paper in its brief at page 32 for a different proposition. The only question really is whether a reasonable third party reading that statement could reasonably conclude that there had been some prior disclaimer that they could rely on that would exclude these very accused devices. And why doesn't it apply to the other patent? If you look at the 331 prosecution history, the trial court held that by distinguishing his invention from the Paul Maas prior art, Mr. Bonneau had disclaimed coverage of any stent in which any ring had any single connection to any other ring. But that's not what Mr. Bonneau said. And this is complicated. It takes a little while. But the examiner first rejected Mr. Bonneau's patent over Paul Maas on the basis that the entire Paul Maas device anticipated. And so, of course, Mr. Bonneau had to address that. And he said, I've got a figure here that I used to illustrate this. What he said was the straight connectors, the straight segments that form these peaks in Paul Maas, the straight ones are in red, the peaks are in blue, are also connected at intermediate points, the yellow in this picture. And he said my claims prohibit that. The straight segments that form these peaks cannot connect to one another except at the ends. He never said the straight segments couldn't connect to something else. He only said if you read the comments in context, they can't connect to one another except at the ends, and Paul Maas doesn't have that. But then the examiner said, well, but I can find a ring which is just the top section of Paul Maas. So I'm saying that that top ring anticipates the claims. So what did Mr. Bonneau say in response to that? Well, first he complained that the examiner was using 20-20 hindsight for the benefit of Mr. Bonneau's own disclosure to unfairly come up with something that Paul Maas really hadn't invented. But complaining about hindsight doesn't get you anywhere in the patent office when you've got an anticipation rejection. So he had to go on and really explain why his claimed invention, claimed language, was different from this ring that the examiner had found at the top of Paul Maas. And he did that. If you look at what he actually said, what he said was the present claims are believed to exclude the particular additional elements of Paul Maas. So I've drawn here the ring up at the top that the examiner was talking about. And what Mr. Bonneau said was the particular additional elements, not any additional elements, but the particular additional elements in Paul Maas destroy the argument that there's anticipation. Why? Because he pointed out to the examiner that his claims required a plurality of upper and lower peaks. And he said, when you take a look at all of these things that you're calling lower peaks, Mr. Examiner, each one of them is connected, not once, but actually twice, to further structure. Every single one of them. Those look like intermediate peaks. The argument was made that these are not peaks, because in order to be peaks, they have to be at the top. That's right, they're not peaks at all. Yes. Right. But that's because all of them, every one of them, is connected to further structure. He never said that if- So if all but two were connected to further structure, then that distinction wouldn't apply. Exactly. As long as there's a plurality of both upper and lower peaks, the claims are covered. But he wasn't disclaiming anything. He was simply pointing out that his claim limitations required a plurality of both upper and lower peaks. And unlike Paul Maas' device, if you look at the accused's stand, there's a picture of the Boston Scientific Express. You can see there's an occasional connection, but there's a plurality of both upper and lower peaks on all of these. Same thing for the ACS multilink. Pretty poor picture here, but if you look in the appendix materials, you'll see there's a plurality of both upper and lower peaks. So he did not disclaim coverage of a stent that has rings connected, where there's any connection. The trial judge painted with way too broad a brush here. If you look carefully at what he said in context, not taking little snippets out of context, but if you look at what he said in context, all he was saying was that Paul Maas had no lower peaks. These accused devices have lower peaks. But also to finish up on my point about the 053, point out that in that same set of papers filed back in June of 01, the applicant said with regard to the 053, this last patent, applicant does not believe that this prior application, referring to the 331, or its file history is applicable to the present case. The scope of the claims applicant seeks is clear and independent on any arguments that may have been made in the previous cases. I don't know how anybody could have made it any clearer to a third party reading the prosecution history of the 053 that any prior remarks in 331 had no bearing on the scope of the claims in 053. The other point I'd like to cover, Your Honor, is the trial court's decision that Medtronic had to show that if you sawed apart these accused stents into their individual rings, each of the individual rings would have had to stay in place in the vessel long enough to hold the entire vessel open. The trial court found no infringement on that basis. The trial court relied on the specification in arriving at the conclusion that the stent must be a device that's capable entirely on its own of holding open the vessel walls. But the specification here not only doesn't support that interpretation, but it actually refutes it. It says on multiple occasions that you may need to implant multiple Bonneau stents in order to treat a single lesion. That's throughout column 2, and particularly column 6, lines 27 to 41, which are appendix pages 130 and 131. The appellees rely on a statement in the specification that says the preferred embodiment is preferably long enough to maintain its position under the conditions of blood flow and hemodialysis, it's called, I think, hemodynamics. Hemodynamics. Hemodynamics. Preferably. But that's a statement that's about what the preferred embodiment preferably does. Somehow the appellees here convince the district court to take a statement that talks about a preferred property of a preferred embodiment and apply it to the entire definition of any stent. If you look at the actual specification by saying that a preferred property of a preferred embodiment is that it does certain things, it's clearly signaling that the stent concept as a whole is broader than simply that. So the specification does not support the trial judge's narrow interpretation. And, in fact, it refutes it. The appellees also rely on another remark, again, in the prosecution history, this time of the 278 patent, as a clear and unmistakable disavowal. Here again, first of all, I point out it has no applicability to the 053 patent for the same reasons I said before, and also because in the 053 patent the rings don't have to be stents. In the 053 patent it calls for a stent comprised of a plurality of rings. Clearly rings are something that don't themselves have to be stents. But even as to the 278 claims, the appellees really vastly overstate the significance of the actual statement that was made. All that was said was that in a multiple stent device, this is at A618, each of the rings has to be strong enough to maintain the patency of the vessel once expanded at the affected site. The applicant never said you had to be able to physically saw apart the individual rings to see if they would stay in place long enough to hold the vessel open over a long period of time. There was nothing about how long they had to stay in place. In fact, that was the evidence that the defendants, the appellees, put in here. They didn't put in evidence that their rings weren't strong enough. What they said was if you take these little segments that you get by sawing apart their overall stents, they wouldn't stay in place long enough. They would migrate up or down the vessel because of what was going on in the body. But that's not what was said in the supposed disclaimer in 278. It didn't address that. And as I pointed out, the specification really talks about that as a preferred property of a preferred embodiment. The defendants aren't selling little individual rings that are sawed apart. They're selling these rings as part of an overall device that anchors these rings in place. They brag in their product literature about the fact that their devices are successful. They are holding people's vessels open. They are holding the legions open. There was plenty of testimony in the record. Excuse me. There was plenty of evidence in the record to support the proposition that the rings of the appellee's stents are strong enough to hold open the vessel wall. There was an extensive report by Medtronic's expert, Dr. Sagel, which is at A3608 to 3626. And there was even testimony from Boston Scientific's expert on stent design who talked about the Boston Scientific express stent. This one here. He actually said even if you sawed apart the express stent, the macro elements, which are the larger of the rings, as many as 90% of them would stay in place for some period of time and would hold the vessel open for some period of time. All he said was it's not appropriate. It's not acceptable in the marketplace if you have 10% migration, 5% migration over time. That's not a good thing. But he didn't say they were physically not capable of holding open the part of the vessel that they come in contact with. So I don't think there was the evidence to support the trial judge's finding that there was no issue of fact. I think all we had to show was there was an issue of fact. And I think the trial judge got the claim interpretation. Can I resume the rest? Yep. Before you go, I didn't see your name on the briefs. So which firm are you with? I'm with Foley and Larder. I'm afraid I substituted in about two weeks ago. Thank you. Mr. Jakes? Good morning. May it please the court. I'm here on behalf of ACS this morning. Mr. Damaris is here on behalf of BSC and Med Mall. And we're going to split the time. Medtronic has several hurdles to overcome in order to have the judgment overturned in this case, just starting with the definition of stent. At least for ACS's stent, there's no evidence that the individual rings meet the district court's definition of stent. So they are stuck with trying to challenge that claim construction. If you read their brief, it's not exactly clear what they believe to be the correct claim construction. They even offer a new construction in their reply brief. But we think the district court got it right, based on the specification and the intrinsic evidence. The specification calls a stent a device for mechanically keeping the affected vessel open. That's essentially what she said. Patent. Patent means open. It's the same word. Patent as opposed to patent. Correct. And in the prosecution history, at pages A321 and A343, for example, the applicants argued very specifically that the end portion of the Palmaz ring could not be used alone as a stent. Now, Mr. Florsheim has said that the district court required them to saw apart the rings of our stents in order to prove infringement. Well, that's really not our problem. That's because they chose to try to read the word stent on a portion of a stent. And by trying to read it on a portion, they have set up that burden for themselves, and they didn't meet it. And under the court's claim construction, the stents don't meet terminology. That applies through to the rest of the patents. That definition of stent, the word stent, is used throughout the patents, and it also applies to the other terms, circular member and ring, which the court said means a stent. What about the disclaimer as applying to the 05 pre-patent? Well, Your Honor, the terms circular member and ring don't appear anywhere in the specification. So what meaning was the court to give those? We look to the prosecution history again, and at least for the 278 patent, in the claim language itself, it says a plurality of M circular members defining a plurality of stents. Circular members define stents. So how are they being used differently? Well, they're not. And if you look further at the actual claim language that says what a stent is, it gives the structure of it, namely substantially straight segments that are connected end-to-end. Well, what is that? Well, the patent describes that as a stent as well. So they've tried to change the terminology, but the only structure that is disclosed or that corresponds to the remainder of the claims is still a stent. So circular member, ring, and stent all mean the same thing in this patent? They do. They don't all mean the same thing in the patent specification because two of those terms don't exist. But when they were used in the claims, they had to mean stent because that's what's disclosed, and the structure describes a stent as also disclosed in the patent. So I'd say a stent is a stent by any other name. On the other issues, substantial stents. Let's stay, if we may, with the 053 patent for a moment. What was the—refresh me on the sequence of events having to do with the submission of the paper in which the—to characterize it the way your opposing counsel has it— the disclaimer, if any, was withdrawn. What was the sequence of events before the examiner doing in which that paper was submitted? I'm not sure which sequence you're referring to. Well, I'm talking about the paper that is an issue that asserts that there was not a disclaimer as applied to the 053 patent after the filing of the application that openly deterred the 053. There was an argument made for patentability. There was an interview, and this paper was submitted. Submitted after the interview? I believe so. And the assertion is that this—therefore, any force given to the prior disclaimer has to be neutralized by that paper that one can effectively disclaim. One can undisclaim, and this undisclaims. Well, I would think that in order for there to be a clear undisclaimer, it would have to be clear. And that's not really apparent from this particular paper, what the disclaimer was. I would think if you were going to undisclaim something, you'd have to say, my prior claims were limited to this. I don't want that anymore. But instead, there's a vague reference to a disclaimer, not exactly explaining what that disclaimer is, and then saying, and would like to kind of go forward from here. But if you realize what they did, in the claim language, they used the term circular member, which was earlier defined as being—defining a stint. They used the same term. So that really can't change from one to the next. And although they may want to change the scope of the claims, I would think in order to do that, there would have to be something more explicit other than saying, all bets are off, let's start over. Assuming that a person, a reasonable person, reading the filed history would understand the reference to the disclaimer and the undisclaimer, why isn't that all that's required? I mean, I'm not sure what you mean by it has to be more specific. I mean, if I have disclaimed something, that disclaimer has become an important aspect of the potential interpretation of the scope of my claims. What's wrong with saying whatever I previously had been thought to have disclaimed for purposes of this application, all bets are off? We don't know what that disclaimer is. There could be multiple disclaimers. Which disclaimer are we talking about? I would think you'd have to say my previous claims were limited in this way. It's obviously very clear when you have a limitation that is being taken out of the claims. You could say I don't want that limitation anymore. But here, they went back to using the term circular number. They defined the structure in the same terms, substantially straight segments connected at their ends. There's no real difference in the structure of the claims. So what disclaimer were they trying to erase? It would have to be more explicit, I think, for a person reading that prosecution history to understand that to be negating a specific disclaimer. I guess otherwise one could argue, I suppose, that any time you have a subsequent patent, just as a matter of course, you put in a paper that says any and all previously made disclaimers are hereby undisclaimed. Exactly. Before I turn the podium over to my co-counsel, I just did want to make one additional point about substantially straight segments. The district court's construction is that portions of the stent that are straight are nearly straight and extend the length of the stent. Now, in ACS's device, those segments are not straight, even if you try to read them on the ring. We say that's not a proper way to do it. But even if there's an attempt to read that plain language, which is not challenged on this appeal on the ring, ACS's rings do not have straight segments. They're curved, and that's undisputed. And that's an additional argument. Mr. Desmarais. Thank you, Your Honor. It may have pleased the court if I might jump in on Your Honor's last point. The sequence of events and what happened in the patent office is critical on their argument to undo the disclaimer. What actually happened in the 053 prosecution history was there was an interview. The claims were rejected. There was an interview with the examiner, and the examiner put in his interview summary. He doesn't say anything about undoing the disclaimer. He doesn't say anything about showing the competitor's products. He doesn't even mention in the interview summary that that even occurred. Subsequent to that, there are two documents in the file. One is a reply to the rejection, a separate document entitled Information from Related Litigation, and that's at A1232. It has nothing to do with the arguments. It has nothing to do with getting around the rejection. It's a separate document. Buried in that document on the fourth page of the bottom sentence is where this alleged undisclaimer is. It's not even in the response to the rejection. And all it says is we're making different arguments here and we're not trying to rely on the earlier file history. That's all they said. They don't say they're undoing the disclaimer, and it's buried on the fourth page of an informational document. It is not the response to the rejection. Moreover, the examiner never relied on it. If you look at the 053 file history in the table of contents, the reply and this document are not listed in the table of contents. If you look at the notice of allowance, which is at A1262, they don't even mention it. The notice of allowance allowed the claims because of the interview, and it says in the statement of reasons for allowance, because of the interview we don't find a problem in allowing the claims. The reply in this statement of undisclaimer came in after the examiner already allowed the case. It wasn't relied on by the Patent Office. It's not listed on the table of contents. It is not relevant to what the examiner thought when the examiner allowed the claims. That's what somebody from the public would know when they read this application. They would look at a rejection. They would look at an interview summary that says we just spoke about Hamas and Gianturco and the applicant's products, and then the examiner allowed the case. If they even bothered to look at the document that's not cited as part of the file history, this reply, in the reply to the arguments, the undisclaimer is not even listed in there. You have to then go to the informational document about information about related litigations, and in one piece talking about the ACS litigation, they say we're looking to patent. We're not looking to rely on the earlier file histories. They don't say why. They don't say we don't want to live with the arguments. They don't say we don't abide by the disclaimer that we made. So it's not clear. It's very disavowal of the earlier disclaimer. Someone from the public probably wouldn't even notice it, and the patent examiner didn't even rely on it. So picking up on that point, the 053, even if you look at the 053 without the earlier disclaimer, you have to come to the same kind of construction anyway. The terms in the 053, this straight segments connected end-to-end, are the exact same terms as the earlier three patents. In the earlier patent file histories, the applicant said unequivocally, straight segments connected end-to-end form peaks. In my invention, there is nothing above the peak and nothing below the peak. They said it over and over again at every opportunity. So that was a definition. They put in a definition of peaks in those earlier applications. They cited Webster's, and they put in a definition. Peak is the very top or the very bottom. That was not undone at all by the 053 because the 053 uses the same claim terms. It relies on the same specification. Under this Court's Phillips decision, you would come to the same conclusion of what those terms mean anyway, even without the disclaimer. What the disclaimer did in the earlier applications was make clear what the claims already cover, what you would have to draw the conclusion of by reading the specification and the claim terms. So I think on that point, there was no clear disavowal of that earlier disclaimer. It wasn't relied on by the patent office, and it really should be a non-issue. To pick up on Your Honor's point about rings and circular members and the other points, those are clearly used by the applicant to mean stent. And I can give you some quick examples. Firstly, the endovascular support member, if you look at their proposed definition below, they proposed to the District Court that that means a structure to be implanted in a vessel to hold it open. That was their definition proposed below for endovascular support. On circular member, which is another new term, not in the specification but added to the claims, in the very claim language, it says for the 278 Patent Claim 1 that M unitary wire-like circular members define a plurality of M stents. That's their own claim language. They say circular members are stents. In the 278 file history, with regard to that same point at A604, they say circular members are stents. At A615, again in the 278 file history, they say circular metal elements are sinusoidally shaped stents. These are the applicant's words. In the 382 prosecution history, they deal with stent members, another new term not in the specification. They define stent members at A725-726 as endovascular support devices or stent members 10 as discussed in the specification at Column 6. When you go to the specification, 10 is the stent, and Column 6 describes the full stent. Again, in their words, in the 382 prosecution, they define stent members as a stent. Then in the 053, clearly they use 053 again. They bring up a new word, rings. But in the claim language, the rings are defined as generally sinusoidally shaped, plastically deformable rings with these straight connectors end-to-end. And when we look at the 278 prosecution history, they said in the prosecution history unequivocally sinusoidally shaped elements are stents. And then when you look at what they said in the prosecution history of the 053 to get around the double-patenting reduction, they said to the patent office, it is true that if you go to the stent claims of the 331 patent, those stent claims cover the sinusoidal rings here in the 053. Clearly, again, it created stents with the rings. So the district court was all sabotage. Thank you. Mr. Forsheim. Thank you. With regard to the question that Judge Bryson raised with regard to whether the disclaimer was clear, that the withdrawal of the disclaimer was clear, I think if you look at the language, it could not be any clearer. Applicant does not believe that this prior application or its file history is applicable to the present case. The scope of the claim's advocacy is clear. I had it marked. Is that? 1235. I've got 1235. Is it? Okay, the last sentence. So I don't think it could be any clearer. Now, in Springs window fashions, as the case in which this court pointed out, you can withdraw a prior disclaimer. In that case, the plaintiff did not do so. The court pointed that out, but it says you can do that, and I think this is a very clear way of doing it. If the applicant does that, then the applicant's got to live with that in terms of the examiner possibly coming back and saying, well, if you're doing that, I'm going to now reject these claims on the basis of X, Y, and Z, and you've got to live with that. But the applicant ought to be allowed to do that. It's a real question, though, isn't it? There's no doubt that if you've made an improvident disclaimer that you ought to be able to come back and say, whoops, I made a mistake, all bets are off. I don't intend that disclaimer to be binding, assuming the case is still in a proper posture before the examiner. But if that is done in a setting in which it isn't likely that the examiner would be looking at the withdrawn disclaimer for purposes of determining patentability, obviously you can't simply throw something into the record at the end and say, well, there we are. I'm not stuck. And the question is, which category does this fall in? This statement was made on June 11, 2001. The notice of allowance issued on July 23, 2001. In between, there are pages and pages and pages of the examiner looking at the information that was filed in June in the IDS. A very lengthy IDS, and the examiner's striking through and read all these things. So this was not after the examiner had put the file away and said, okay, no more of that. So that's not this case. Okay. Thank you very much. The case is submitted.